## MIDDLEBROOKS, d/b/a WEKIVA FALLS RESORT v ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

Case No. 86-2101

State of Florida, Division of Administrative Hearings

March 10, 1987

### APPEARANCES OF COUNSEL

**Martin S. Friedman, Myers, Kenin, Levinson & Richards,** for petitioner.

**Wayne E. Flowers** for respondent.

### OPINION OF THE COURT

MICHAEL M. PARRISH, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to notice, a formal hearing was conducted in this case on November 6 and 7, 1986, in Orlando, Florida, before M. M. Parrish, a duly designated Hearing Officer of the Division of Administrative Hearings. At the hearing the parties were represented by counsel.

## INTRODUCTION AND ISSUES

In their Prehearing Stipulation, the parties described the nature of the controversy as follows:

This matter involves a challenge to a Technical Staff Report and Recommendation made by Respondent's staff on a consumptive use permit application for water submitted to Respondent by Petitioner. Petitioner owns a recreational facility where water is being used. The Staff Report recommends that certain conditions be imposed upon the permit proposed to be issued to Petitioner placing limitations on the amount of water which may be consumed by Petitioner and requiring Petitioner to report on numbers of persons utilizing Respondent's facility.

In that same stipulation, the parties described their respective positions as follows:

A. Petitioner's Position:

The present use of water of the Wekiva Falls Resort is a reasonable beneficial use which should not be reduced or limited by permit conditions. The standpipes through which the water flows are not wells and therefore should not be subject to any regulation by Respondent. The placement of the standpipes did not increase the flow of water but rather captured the already existing flow from natural springs which existed on the property prior to the placement of the standpipes. Petitioner feels his use does not come within the permitting power of Respondent, and that if it does, its use should be allowed to continue without any reductions in flow.

B. Respondent's Position:

After review of Petitioner's consumptive use permit application for the use of water emanating from two standpipes, one twenty-four (24) inches in diameter and the other fourteen (14) inches in diameter, the staff of the District determined that the standpipes were wells subject to the District's regulation under Chapter 40C-2, Florida Administrative Code, and recommended approval of the permit with certain conditions requiring a reduction in flow during certain low or nonuse periods.

This matter arose from Petitioner's application to the District for a consumptive use permit that would allocate water to the Petitioner from water flowing from a 24-inch metal pipe and a 14-inch metal pipe for use at Petitioner's campground. The District maintains that, not only is the water that is drawn from the metal pipes and used at the campground regulated pursuant to Part II of Chapter 373, Florida

238

Statutes, but also that the remaining water that flows from the two metal pipes and is used by Petitioner to maintain a swimming area is regulated pursuant to Part II of Chapter 373, Florida Statutes. The Petitioner has not applied for an allocation of water for maintaining the swimming area. Even though the Petitioner has not applied for such an allocation, the use of water for maintaining the swimming area has been evaluated because the Petitioner maintained that, even if the water used to maintain the swimming area is regulated pursuant to Part II of Chapter 373, Florida Statutes, the flow of water from the metal pipes should not be restricted in any fashion from the ongoing flow. Thus, the issues presented are whether the application that was applied for should be granted, whether the Petitioner has to apply for an additional allocation in order to continue using water to maintain the swimming area, and what, if an additional allocation is sought, the permit would be.

In their Prehearing Stipulation the parties also agreed to the following issues of law.

1. The Division of Administrative Hearings has jurisdiction over the subject matter of and the parties to this proceeding subject to Section 120.57(1), Florida Statutes.

2. To the extent the standpipes located on Petitioner's property are determined to be wells, they are governed by and subject to the provisions of Chapter 373, Florida Statutes, and Chapter 40C-2, Florida Administrative Code. The procedural rules which apply to this proceeding are Chapters 40C-1, 28-5, and 22-I, Florida Administrative Code.

The parties also agreed to the following as being the ultimate issues of fact which remained to be litigated.

1. Whether the two standpipes constitute an excavation that was drilled, cored, washers, driven, dug, jetted, or otherwise constructed with the intended use of such excavation to be for the location, acquisition, development, or artificial recharge of water.

2. Whether the continued use by Petitioner of water at pre-permit levels is a use of water in a quantity necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest.

3. Whether the continued use of water by Petitioner at pre-permit levels would increase the danger of saline water encroachment.

4. Whether a reduction in flow of water will result in a reduction in water quality for the uses made of the water by Petitioner.

5. Whether a reduction in flow of water would have adverse impacts on the quality of water in the Wekiva River.

Subsequent to the hearing, a transcript of the proceedings at hearing was filed on December 22, 1986, and, pursuant to request of the parties, they were allowed 30 days from that date within which to file their proposed recommended orders. Both parties filed proposed recommended orders containing proposed findings of fact and conclusions of law. The proposed recommended orders have been carefully considered and a specific ruling on each proposed finding of fact submitted by each party is contained in the Appendix which is attached to and incorporated into this Recommended Order.

## FINDINGS OF FACT

Based on the stipulations of the parties, on the exhibits received in evidence, and on the testimony of the witnesses at the hearing, I make the following findings of fact.

### Findings based on admissions

### *in prehearing stipulation*

1. Petitioner is a private individual who owns and does business as the Wekiva Falls Resort in Lake County, Florida.

2. Respondent, a special taxing district created by Chapter 373, Florida Statutes, is charged with the statutory responsibility of the administration and enforcement of permitting programs pursuant to Part II of Chapter 373, Consumptive Uses of Water, specifically Sections 373.219 and 373.223, Florida Statutes, and Chapter 40C-2, Florida Administrative Code. The District is the agency affected in this proceeding. The District has assigned Petitioner's permit application, which is the subject of this proceeding, the permit number 2-069-0785AUS.

3. On September 4, 1985, Petitioner submitted to Respondent a CUP application number 2-069-0785AUS to withdraw water from two wells, one 14 inches in diameter and the other 24 inches in diameter, located on Petitioner's property in Lake County, Florida.

4. The water which flows from the two standpipes flows through a creek which was improved by Petitioner, said creek having as its terminus the Wekiva River. The standpipes were put in place by Petitioner or his authorized agents or employees in 1972.

5. The area of the Wekiva River into which the creek leading from the two standpipes flows has been designated as an aquatic preserve and an "Outstanding Florida Water."

240

6. On May 23, 1986, Respondent's staff gave notice of its intent to recommend approval with conditions of Petitioner's CUP application number 2.069-0785AUS.

7. Petitioner's Petition for Administrative Hearing was timely filed with the District.

*Findings based on evidence at hearing*

8. Petitioner filed his CUP application on September 4, 1985, one week in advance of the September 11, 1985, deadline for existing users of water to file applications which would establish and protect their existing user status. Petitioner's application requests an allocation of 31.7 million gallons per year (mgy) for the following uses: 8 per cent for cooling and air conditioning, 3 per cent for outside use, and 89 per cent for commercial and industrial use. Petitioner has made no application for any allocation of water for water based recreation.

9. The Wekiva Falls Resort property consists of approximately 140 acres stretching 4800 feet in length between Wekiva River Road and the Wekiva River. The property is located along the Wekiva River between State Road 46 and the Orange County, Florida, line. Seminole County, Florida, is on the opposite side of the Wekiva River from the subject property.

10. Petitioner purchased the subject property in 1968. At that time it was a heavily overgrown rural tract. Petitioner observed a stream which came under Wekiva River Road, passing through seven culverts, and running the length of the property to the Wekiva River. This stream carries runoff from Petitioner's property as well as runoff from areas west of the property on the opposite side of Wekiva River Road.

11. At a point approximately midway between the Wekiva River and Wekiva River Road, along the stream, a depressional area was located by Petitioner, through which the stream flowed. Petitioner observed that more water was flowing downstream from the depressional area than upstream.

12. Petitioner's property is located in an area of natural aresian flow where springs or seeps are not uncommon. Because the area in which the subject property is located is one of natural artestian flow, it is likely that a surficial seep of water existed in the depressional area which generated a flow of water. None of the available geological or hydrogeological information or data would indicate the existence of a spring or springs on this site prior to the drilling undertaken by Petitioner. At the time the first well was drilled by Dick Joyce Well Drilling, Inc., no spring was observed by the driller. Further, in

241

conversations with the Executive Director of the District in 1974, no mention was made by the Petitioner of the existence of a spring or springs at the site prior to drilling.

13. On July 17, 1969, Petitioner measured the stream flow and calculated same to be 23.97 cubic feet per second. The methodology utilized by Petitioner in measuring the stream flow in its natural state was an accepted methodology. However, this measurement did not discriminate between the water flowing into the depressional area from the stream carrying runoff from the lands upstream of the depressional area and the water originating from surficial seeps in the depressional area. Thus, this amount cannot be utilized or relied upon as a measurement of the amount of water emanating from seeps in the depressional area before drilling was undertaken by Petitioner. Nevertheless, other evidence indicates that the total volume of water flowing from Petitioner's property into the Wekiva River was probably substantially the same both before and after the installation of the two wells on Petitioner's property. In any event, the installation of Petitioner's wells does not appear to have increased the flow of the Wekiva River downstream of where Wekiva Canoe Creek discharges.

14. In undertaking the development of his property as a resort/campground/recreational vehicle facility, Petitioner dug out the depressional area and used a dragline to open up the creek from the depressional area downstream to the Wekiva River. At a point approximately 200 feet west of the Wekiva River, Petitioner dredged a wide area to construct a marina with access through the creek to the Wekiva River.

15. In an effort to obtain a controlled flow of water, Petitioner contracted Dick Joyce of Dick Joyce Well Drilling Inc. to drill a well fourteen inches in diameter at a site along the bank of the depressional area designated by Petitioner. The well was drilled by Joyce in August of 1972. The well was drilled using a cable rig to a depth of 107 feet, with casing being driven to a depth of 58 feet. The drilling procedure excavated a hole in the ground, penetrated rock, and resulted in the flow of ground water to land surface. The top of the 14-inch well extends 4 to 5 feet above land surface.

16. In a further effort to obtain a controlled flow of water, Petitioner subsequently contracted Central Florida Drillers to drill a second well, twenty-four (24) inches in diameter. This well was drilled in 1973 along the bank of the depressional area, at a spot identified by Petitioner, in the same general vicinity as the previously drilled 14-inch well. The well was also drilled using a cable rig to a depth of 120 feet

with casing being driven to a depth of 84.7 feet. The drilling procedure excavated a hole in the ground, penetrated rock, and resulted in the flow of ground water to land surface. The top of the 14-inch well extends 5 feet above land surface.

17. Central Florida Well Drillers Inc. prepared and maintained a driller's log of the 24-inch well, recording the composition of the stratigraphic column through which the drilling equipment passed. The lithology shown in the stratigraphic column is indicative of the geology normally found in a well drilled in this geographical area. The log shows penetration of the normal stratigraphic column for this area and does not show a spring bore that had been filled in by materials at an earlier date.

18. The drilling of the two wells by Petitioner substantially altered the natural conditions on the property as they existed prior to 1972.

19. The top of the Floridan aquifer in the geographical region in which Petitioner's wells are located is encountered at depths ranging from 50 to 100 feet below land surface.

20. The amount of water flowing from the wells has been variously reported and calculated since the wells were installed. Petitioner's promotional materials, which bill the resort as home of the "world's largest flowing well," asserts the maximum free flow capacity to be 72 million gallons per day (mgd). At another point in time, flow from the larger well was said to be 28.8 mgd and the flow from the smaller well 11.5 mgd. Respondent's staff, in preparing its technical staff report, calculated the total flowage from the two wells to be 18 mgd. In his application for a permit to operate a public bathing facility filed with the Florida Department of Health and Rehabilitative Services (HRS), Petitioner indicated the total flowage to be 16 mgd. For purposes of the determination to be made by this Order, the parties stipulated at the hearing to a total flowage figure of 12.47 mgd.

21. Petitioner has operated and continues to operate the facility as a campground and water based recreational site. The central theme of the use of Petitioner's property is the recreational use of water. The water based recreation includes swimming, boating, tubing, and fishing, and is centered around the two flowing wells. The designated swimming area extends from a retaining wall located just west of the westernmost of the two wells to a footbridge which crosses Canoe Creek west of the Marina. The supply of water for recreational use comes primarily from the two wells.

22. The stream which originally existed on the property and which carries runoff from the more western part of Petitioner's property and

**243**

from off-site enters the designated swimming area at the retaining wall on its westernmost edge. The water which comes from this stream and which is introduced into the western end of the swimming area contains high levels of bacteria and coliforms. Between the hours of 6:00 a.m. and 6:00 p.m., Petitioner operates a sump pump which redirects this high coliform water eastward around a major portion of the swimming area to a point still within the swimming area. For the remaining twelve hours per day, this high bacteria, high coliform water is allowed to flow directly into the swimming area. Petitioner could reduce the level of bacteria and coliforms in the swimming area by simply operating the sump pump for 24 hours a day and/or introducing the water so pumped back into Canoe Creek at a point further downstream east of the designated swimming area. In addition, runoff from a storm drain which was constructed by Lake County, Florida, as a result of an easement granted to them by Petitioner, enters Canoe Creek at a point downstream from the wells but east of the footbridge, within the designated swimming area. When stormwater is conveyed through this storm drain, it also introduces coliforms into the swimming area at the point where the storm drain intersects Canoe Creek.

23. The gate valves on each of the two wells are frozen in a completely open position. The wells are presently flowing at maximum capacity 24 hours a day without regard to whether the facility is being used or not. Petitioner does not presently have the capability to incrementally control the flow of water, short of utilizing a plug to completely shut off the flow of water from one or the other or both of the two wells. Petitioner does, however, have the capability of installing a hydraulic cylinder remote control system in the wells which would allow him to control the flow of water incrementally from the wells via a phone line.

24. The use of Petitioner's facility varies by season, month, day of the week, and time of day, and according to weather conditions on a particular day. Although Petitioner did not have records available showing the number of persons utilizing a particular part of the facility for a particular purpose on a particular day, most of Petitioner's revenues, at least during the summer months, is generated by day use swimmers and picnickers. The swimming facility is most heavily used during daylight hours in the summer months. More customers use the swimming facilities on Saturday and Sunday than during the weekdays. Use is lower during the winter months and during times of inclement weather such as cloudy or rainy days. The evidence fails to show the average number of bathers who use Petitioner's facilities at any particular season or during any particular weather conditions.

244

25. Petitioner holds a Swimming Pool-Bathing Place Operating Permit for the swimming area issued by the Florida Department of Health and Rehabilitative Services pursuant to Section 10D-5.120, Florida Administrative Code. Responsibility for enforcement of these administrative regulations is with the Lake County, Florida, Public Health Unit. Petitioner's permit allows him to have a maximum swimming pool population of 2000 bathers per day, but there is no evidence that he has ever had that many bathers on a single day since he received the permit.

26. There are two primary water quality parameters which Petitioner is required to maintain within the swimming area, which are delineated in Rule 10D-5.120, Florida Administrative Code. The first is a flow-through requirement of 500 gallons of water per anticipated bather per 24 hours. On a day when the swimming facility is being utilized by the maximum number of bathers allowable, 2000, the flow requirement for that day would then be one million gallons. For any day when the bathing population fell below 2000, the gallon flow-through requirement would be proportionately reduced.

27. The second water quality parameter Petitioner is required to maintain relates to coliform densities. High coliform count can result in serious illness. The coliform density in the swimming area must not exceed 1000 most probable number of coliform organisms per 100 milliliters.

28. Coliform levels in the swimming area at any given time are dependent upon several variable factors. Among these factors is the number of coliforms being introduced into the swimming area. As has previously been discussed, when the sump pump which reroutes high coliform water around the upper part of the swimming area is not operating, the number of coliforms would increase. Also during periods of rainfall, coliforms are washed into the swimming area in runoff which enters from overland and through the storm drain which enters the lower part of the swimming area.

29. Temperature is a variable factor which affects coliform levels. As temperature increase, bacteria multiply more rapidly, and thus coliform levels increase. The number of human beings utilizing the water at a given time impacts coliform levels in that, since humans are producers of coliforms, when greater numbers of humans are in the water, higher coliform levels would normally result. These factors coalesce in that high temperatures normally occur during the summer months which contain the days of most intense usage, and thus high coliform levels would be expected during these times if all other factors remain

**245**

constant. Conversely, during the winter months, when facility usage is lowest and temperatures are lowest, lower coliform levels would be expected.

30. One additional variable factor which affects coliform levels is the amount of water flowing through the swimming area. Water dilutes any contaminants or pollutants that come into the system. Petitioner attempted to show a correlation between rate of flow and coliform levels in excess of 1000 parts per 100 milliliters (ppm). (Petitioner's Exhibit #1) However, because the data collected did not control for and did not take into account the presence or nonpresence of the variable factors which affect coliform levels, no conclusions could be reached regarding whether water quality could be maintained in the swimming area in accordance with HRS standards, with periodic adjustments to flow from the wells. No competent substantial evidence was offered to show that periodic adjustments to flow would prevent Petitioner from meeting HRS standards for water quality and therefore prevent Petitioner's continuing the operation of his public bathing facility.

31. The original permit application filed by Petitioner only requested an allocation of 31.7 million gallons per year (mgy), this amount being only the water utilized for the campground. The construction of Petitioner's potable water supply for the campground was approved by the Florida Department of Environmental Regulation and meets all water quality standards applicable to the campground. Although the water used for the campground comes from a pipe connected to the 24-inch well, this request for water is not related to and does not account for the water which flows from the wells into the swimming area and out through Canoe Creek and is used for recreational purposes.

32. The technical staff report (TSR) prepared by Respondent's staff recommends granting an allocation of 31.7 mgy of water to Petitioner for commercial and household uses (to supply the campground) and an allocation of 2.55 billion gallons per year (bgy) of water for recreational uses. The recommended allocation for recreational use breaks down to an average daily use of 7 million gallons per day (mgd), representing a 44 per cent reduction in the amount of water presently flowing from the wells for recreational purposes. The TSR further recommends a maximum daily use for any one day of the year of 18 million gallons of water. This recommendation actually exceeds the present production capacity of the wells.

33. The TSR further recommends that the overall 44 per cent reduction in use of water for recreational purposes be achieved by

246

adjustment of well discharges during nonuse periods each day and seasonal nonuse periods when bathing and marina use are minimal. This would require installation of operable valves on each of the wells as is also recommended in the TSR. Subject to the limitation imposed by the annual allocation and subject to the maximum daily allocation, Petitioner would make the flow adjustments as conditions warrant and as he sees fit.

34. The Floridan aquifer in the region surrounding Petitioner's property is not expansive; thus there is a maximum amount of water which can be stored within it. Water will tend to discharge at some point within the system when flow is stopped at another point. The drawdown effect on the potentiometric head caused by the 24-inch well after flowing for a period of twenty-four hours can be calculated to extend up to two miles west of that well and further to the east. The excess water flowing through Petitioner's wells, over and above that required for recreational purposes, could be tapped and used by other potential consumers of water within the same vicinity, if Petitioner reduced the flow from his wells.

35. Underlying the Floridan aquifer in the Wekiva River Basin Area is a layer of saline water, the degree of salinity being measured by the chloride concentrations in said water. This underlying saline water is relic sea water and is not salt water being pulled in from the oceans. When water is discharged from the Floridan aquifer and potentiometric pressures are thereby reduced, saline water is allowed to move upward and closer to the Floridan aquifer, resulting in higher chloride concentrations in the water discharged from the Floridan aquifer. The converse is also true. Reductions in discharge tend to increase potentiometric pressures which, in turn, would push the saline water further away from the Floridan aquifer.

36. Chloride concentrations are the basic measurement of water quality. In measuring chloride concentrations in water, 250 milligrams of chloride per liter of water if the significant figure because this measuring point is the highest concentration of chloride that is recommended for public drinking water supplies.

37. Data has been collected regarding chloride concentrations in water taken from the Floridan aquifer beneath the Wekiva River basin and shows significant changes during the period from 1973 to 1986. In a United States Geological Survey (USGS) study of water quality in the Floridan aquifer beneath the Wekiva River basin, conducted in 1973-74, an area or isochlor of water with chloride concentrations exceeding 250 (ppm) was identified. Petitioner's wells were included in

247

this tudy, and the chloride level in his wells was measured at 230 ppm. The isochlor depicting water with chloride concentrations exceeding 250 ppm extended southward to a point north of Petitioner's property.

38. A follow-up study begun in 1986 shows that the area or isochlor of water with chloride concentrations exceeding 250 ppm has extended itself, moving southward to include and pass the Petitioner's wells, past the Lake County border line which lies to the south of Petitioner's property and into Orange County, Florida. In 1986 Petitioner's wells produced water which measured 296 ppm and 312 ppm respectively.

39. Because the 1986 study was not complete as of the time of hearing, no clear determinations can be made as to the extent to which the Petitioner's wells have contributed to the southward migration of the 250 mg/1 of chloride base line. At a minimum, the withdrawals of water from Petitioner's wells is having a localized impact in the immediate vicinity of those wells. Reduction of the flows from Petitioner's wells would, at a minimum, result in an improvement in the chloride levels in a localized area. That improvement in conjunction with similar improvements at other wells in the area could ultimately result in a more regional improvement of the chloride levels.

40. Because of the factors observed indicating a deterioration of the aquifer systems in the face of increased demand, Respondent's staff has created Special Condition Zones in an effort to identify area within the Wekiva River basin where hydrologic conditions warrant concern and special attention. Zone One, in which Petitioner's property is located, is the area of greatest concern because of observed changes within the hydrologic regime. Special permit conditions have been created for these zones to insure that no more water than is needed for a specific purpose is allocated to any user in the area.

41. The flows from Petitioner's wells provide a benefit to the Wekiva River by diluting the pollutants which flow into the river. The cascading water from the standpipes aerates the water, which in turn increases the oxygen levels which is of benefit to the invertebrates, fish, and other animals that live in the water. The flows from Petitioner's wells account for approximately six or seven per cent of the flow of the Wekiva River at the gauging station at State Road 46. Nevertheless, no persuasive competent substantial evidence was offered to show that an overall 44 per cent reduction in flow from Petitioner's wells would in any significant way impact the quality of water in the Wekiva River.

42. The District staff recommended that numerous "standard general conditions" and numerous "other conditions" which relate specifically to this project be incorporated in Petitioner's CUP permit. Those

248

conditions are set forth at length in Respondent's Exhibit No. 6 and it would serve no useful purpose to repeat them all here.

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact and on the applicable legal principles, I make the following conclusions of law.

1. The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding. Sec. 120.57(1), Fla. Stat.

2. The District is the administrative agency which has the authority to administer and enforce the provisions of Chapter 373, Florida Statutes, and the delegated provisions of Chapter 403, Florida Statutes, as well as the rules and regulations promulgated thereunder, including Chapter 40C-2, Florida Administrative Code.

3. The District is authorized to require permits for the consumptive use of water and to impose such reasonable conditions as are necessary to assure that such use is consistent with the overall objectives of the District and is not harmful to the water resources of the area. See Sec. 373.219, Fla. Stat.

4. Pursuant to Rule 40C-2.041(1), Florida Administrative Code, unless expressly exempted by law, a consumptive use permit is required:

(a) If the average annual daily withdrawal is to exceed one hundred thousand (100,000) gallons average per day on an annual basis;

(b) If the withdrawal equipment or other facility has a capacity of more than one million (1,000,000) gallons per day;

(c) If the withdrawal is from a combination of wells or of other facilities or of both, having a combined capacity of more than one million (1,000,000) gallons per day; or

(d) If the withdrawal is from a well in which the outside diameter of the largest permanent water bearing casing is six inches or greater. For purposes of this section, the diameter of the well at ground surface will be presumed to be the diameter of the well for the entire length unless the well owner or well contractor can demonstrate that the well has a small diameter water bearing pipe below ground surface.

5. Section 373.303(7), Florida Statutes, defines the term "well" as follows:

"Well" means any excavation that is drilled, cored, bored, washed,

**249**

driven, dug, jetted, or otherwise constructed when the intended use of such excavation is for the location, acquisition, development, or artificial recharge of ground water. . . .

6. Section 373.203(2), Florida Statutes, defines the term "artesian well" as follows:

An "artestian well" is defined as an artificial hole in the ground from which water supplies may be obtained and which penetrates any water-bearing rock, the water in which is raised to the surface by natura flow, or which raises to an elevation above the top of the water-bearing bed. "Artesian wells" are defined further to include all holes, drilled as a source of water, that penetrate any water-bearing beds that are a part of the artesian water system of Florida as determined by representatives of the Florida Geological Survey or Department of Environmental Regulation.

7. Section 373.209, Florida Statutes, reads as follows, in pertinent part:

(1) No owner, tenant, occupant, or person in control of an artesian well shall knowingly and intentionally:

(a) Allow the well to flow continuously without a valve or mechanical device for checking or controlling the flow.

(b) Permit the water to flow unnecessarily.

(c) Pump a well unnecessarily.

(d) Permit the water from the well to go to waste.

(2) A well is exempt from the provisions of this section unless the Department of Environmental Regulation can show that the uncontrolled flow of water from the well does not have a reasonable and beneficial use, as defined in § 373.019(5).

8. Section 373.206, Florida Statutes, reads as follows, in pertinent part:

Every person, stock company, association, corporation, county, or municipality owning or controlling the real estate upon which is located a flowing artesian well in this state shall, within 90 days after June 15, 1953, provide each such well with a valve capable of controlling the discharge from the well and shall keep the valve so adjusted that only a supply of water is available which is necessary for ordinary use by the owner, tenant, occupant, or person in control of the land for personal use and for conducting his business.

9. Section 373.223(1), Florida Statutes, reads as follows:

250

(1) To obtain a permit pursuant to the provisions of this chapter, the applicant must establish that the proposed use of water:

(a) Is a reasonable-beneficial use as defined in § 373.019(4);

(b) Will not interfere with any presently existing legal use of water; and

(c) Is consistent with the public interest.

10. And Section 373.226, Florida Statutes, goes on to provide as follows with regard to existing uses:

(1) All existing uses of water, unless otherwise exempted from regulation by the provisions of this chapter, may be continued after adoption of this permit system only with a permit issued as provided herein.

(2) The governing board or the department shall issue an initial permit for the continuation of all use in existence before the effective date of implementation of this part if the existing use is a reasonable beneficial use as defined in § 373.019(5), and is allowable under the common law of this state.

(3) Application for permit under the provisions of subsection (2) must be made within a period of 2 years from the effective date of implementation of these regulations in an area. Failure to apply within this period shall create a conclusive presumption of abandonment of the use, and the user, if he desires to revive the use, must apply for a permit under the provisions of § 373.339.

11. The *Applicant's Handbook Consumptive Uses of Water,* (hereinafter "Applicant's Handbook"), which is adopted by reference by Rule 40C-2.101(2), Florida Administrative Code, defines the term "consumptive use" as follows, at Section 2.0(e): "Any use of water which reduces the supply from which it is withdrawn or diverted."

12. Pursuant to Section 10.3 of the Applicant's Handbook, the following criteria must be met in order for a use of water to be considered to be a reasonable beneficial use:

(a) The use must be in such quantity as is necessary for economic and efficient utilization. The quantity applied for must be within acceptable standards for the designated use (see Section 12.0 for standards used in evaluation of need/ allocation).

(b) The use must be for a purpose which is both reasonable and consistent with the public interest.

(c) The source of the water must be capable of producing the

requested amounts of water. This capability will be based upon records available to the District at the time of evaluation. An eight of ten year capability will be considered acceptable.

(d) The environmental or economic harm caused by the consumptive use must be reduced to an acceptable amount. The methods for reducing harm include: reducing the amount of water withdrawn, modifying the method or schedule of withdrawal, or mitigating the damages caused (see also subsection 9.4.3 and 9.4.4 of this Handbook).

(e) To the degree which is financially, environmentally, and socially practicable, available water conservation and reuse measures shall be used or proposed for use.

(f) The consumptive use should not cause significant saline water intrusion or further aggravate currently existing saline water intrusion problems.

(g) The consumptive use should not cause or contribute to flood damage.

(h) The water quality of the source of the water should not be seriously harmed by the consumptive use.

(i) The water quality of the receiving body of water should not be seriously harmed by the consumptive use. A valid permit issued pursuant to Section 17-4.24 or Section 17-4.26, *F.A.C.,* shall establish a presumption that this criterion has been met.

Paragraphs (c), (g), and (i) are not in issue here.

13. The Petitioner uses water for the campground as well as for the swimming area. The Petitioner does not dispute use of water at the campground, but does dispute use at the swimming area. The greater weight of the evidence supports a conclusion that the Petitioner uses water at the swimming area. He would hardly be opposing restrictions on flow if he did not. The greater weight of the evidence also supports a conclusion, based largely on water quality changes in the aquifer, that Petitioner's use results in a reduction in the supply. The Petitioner's evidence concerning the reasons the two pipes were installed establish that Petitioner withdraws or diverts the water. Accordingly, it must be concluded on the facts in this case that Petitioner makes a consumptive use of water for both the campgrounds and the swimming area.

14. Petitioner, on the average, withdraws 12.47 million gallons per day over a year from the pipes and put that water to use. Likewise, the pipes, which are the equipment or facility through and by which

Petitioner withdraws the water, have a capacity of more than one million gallons per day. This is true whether the metal pipes are wells or not. Accordingly, the Petitioner's use meets and crosses the thresholds set forth in Sections 40C-2.041(1)(a) and (b), Florida Administrative Code, and Petitioner is therefore required to obtain a permit for use of water at the campground and swimming area pursuant to those two thresholds.

15. Additionally, Petitioner's use at the campground and swimming area also exceeds the thresholds set forth in Section 40C-2.041(1)(c) and (d), Florida Administrative Code, and thus requires a permit because the two standpipes are wells, each with a diameter in excess of six inches and they together have a capacity of at least 12.47 mgd.

16. By the use of drilling equipment utilized by Dick Joyce Well Drillers in the case of 14-inch well and Central Florida Well Drillers in the case of the 24-inch well, Petitioner caused excavations or holes to be created in the ground. The excavations, which went to a depth of 107 feet in the case of the 14-inch well and 120 feet in the case of the 24-inch well, penetrated water-bearing rock and were clearly made for the purpose of locating, acquiring, and developing ground water. As a result of the excavation and placement of well casing, water was raised to an elevation above the top of the water-bearing bed. The 14-inch and the 24-inch casings are then wells under either of the statutory definitions set forth regardless of how close they were drilled to an existing spring or seep.

17. Petitioner used water at the campgroun and swimming area at the date of implementation of consumptive use permitting by the District in the area within which the Petitioner's property is located, i.e., the lower St. Johns River basin. The Petitioner applied for a permit in regard to use at the campground but not the swimming area. Application for the use at the campground was made at a time which made Section 373.226(2), Florida Statutes, applicable to the use at the campground. However, the Petitioner has failed to submit an application concerning the use at the swimming area, so Section 373.223, Florida Statutes, and not Section 373.226(2), Florida Statutes, will apply to Petitioner's use at the swimming area. Since a permit has not been applied for, the District may order use of water at the swimming area discontinued. See Sec. 373.219, Fla. Stat.

18. Existing users of water are entitled to continue their pre-permitting uses of water upon showing that the existing use is a reasonable beneficial use and allowable under the common law of this state. See Sec. 373.226(1) and (2), Fla. Stat.

19. Reasonable beneficial use means the use of water in such quantity as is necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest. See Sec. 373.019(4), Fla. Stat.

20. The District has calculated that 2.55 billion gallons per year (bgy) is a sufficient amount of water to enable Petitioner to continue to operate his recreational facility, despite the fact no application has yet been made for this usage. The only concern addressed by Petitioner in relation to this criteria (10.3(a)) is whether the staff's recommended allocation is sufficient to allow him to meet HRS water quality standards within the designated swimming area. The recommended average daily allocation is seven times greater than the minimum flow through requirements set forth in Section 10D-5.120(1), Florida Administrative Code, for days on which Petitioner must accommodate the maximum number of bathers he is allowed by HRS to have using the facility. The other water quality standard set forth by HRS, coliform concentration, is largely dependent on variables such as number of persons using the facility, rainfall and temperature. If these variables, either independently or in coalesce, result in unacceptable coliform levels, Petitioner has the flexibility under the proposed permit to increase flows, even up to the maximum capacity, to maintain water quality in the designated swimming area.

21. In this regard it should be noted that Petitioner did not present any evidence regarding the numbers of bathers who actually use his facility. Rather, his arguments against reduction of his flow are addressed largely to the fact that he is *authorized* to have 2000 bathers. For all the record shows, he may have never had that many since his HRS permit was issued. The record does reveal in relative terms that, as one would expect, usage varies greatly depending on the season, the day of the week, and the weather. Those large variations in usage support a conclusion that there are related large variations in the volume of water Petitioner needs to have flowing through his facility.

22. To allow Petitioner's wells to continue to flow unfettered at maximum capacity, even during periods of low facility usage or facility nonusage, is not an economic or efficient utilization of the water. Petitioner does not need a flow of 12.47 mgd every day to maintain his business. The water which now unnecessarily flows to the Wekiva River could be tapped and used for other beneficial purposes within the region. Petitioner does not meet the criteria set forth in Section 10.3(a) or (b) of the Applicant's Handbook without the recommended reductions in flow.

23. Neither is the criteria set forth in Section 10.3(b) of the

254

Applicant's Handbook met without reductions in flow. The public interest is not protected when usable water is allowed to go to waste. A use of water which needlessly wastes water is not a reasonable use of water.

24. The criteria set forth in Section 10.3(d), (f) and (h) of the Applicant's Handbook are interrelated in this instance in that the evidence indicates the existence of a saline water intrusion problem which would be reduced or mitigated by a reduction in withdrawals from Petitioner's wells. Failure to so mitigate the problem could seriously harm the water quality of the source of the water. The District criteria regarding saline water encroachment defines saline water encroachment as:

(a) Movement of a particular saline water interface to a greater distance inland or towards a wellfield than has historically occurred as a consequence of seasonal fluctuation or drought, . . . or

(b) A significant increase from background levels in chloride concentration at the base of the aquifer or producing zone within the area of influence of the wellfield. Background levels are the chloride concentrations before withdrawals commenced.

Section 9.4.2, Applicant's Handbook

These saline water encroachment criteria relate to detrimental effects to the applicant alone or to others; thus it does not matter that Petitioner's use may only be causing problems to his own water supply and not to that of other users in the area.

25. Evidence presented shows that the saline water interface has moved toward Petitioner's wells and, in fact, has moved beyond Petitioner's wells. Further, chloride concentrations within the area of influence of Petitioner's wells have shown a significant increase between 1973-1974 and 1986, with the water from his wells going from being suitable for a public drinking source to unsuitable. Petitioner's continued unabated withdrawals have resulted in saline water encroachment within the area of his own wells, and could be causing or contributing to the regional problem. Petitioner does not meet the criteria set forth at Sections 10.3(f) and (h) of the Applicant's Handbook without a reduction in flow from his wells. The criteria set forth at Section 10.3(d) requires reduction in flow if this will reduce the environmental harm caused by the consumptive use (i.e., saline water intrusion). The greater weight of the evidence indicates that by reducing flow, the saline water interface would recede, at a minimum in the area around Petitioner's wells and possibly over a wider area.

26. The criteria set forth in Section 10.3(c) of the Applicant's

**255**

Handbook requires use of available conservation measures where financially, economically, and socially practicable. In this instance, conservation could be effected through periodic reductions in flow during low use or nonuse periods. This can only be accomplished if operable valves are placed by Petitioner on his wells, as is required by Other Condition No. 9 of the TSR. Only with this conservation method could Petitioner meet this criteria. In addition, Section 373.209, Florida Statutes, prohibits allowing a well to flow continuously without a valve or mechanical device for checking or controlling the flow; thus Petitioner stands in violation of this provision until such time as operable valves are placed on the wells.

27. The use of 31.7 mgy at the campground satisfies Section 10.3(a), (b), (c), and (e), of the Applicant's Handbook. The amount requested is necessary and within acceptable amounts. The use at the campground is for commercial and household use and that is use of water for a purpose which is reasonable and consistent with the public interest. The source can produce the water requested, and the Petitioner employs available conservation and reuse measures.

28. Section 8.2.2 of the Applicant's Handbook lists nine factors which have been identified as being important considerations in determining whether a use is allowable under the common law of Florida. These are:

(a) the purpose of the use;

(b) The suitability of the use to the watercourse or lake;

(c) the economic value of the use;

(d) the social value of the use;

(e) the extent and amount of harm caused by the use;

(f) the practicability of adjusting the quantity of the water used by each use;

(g) the protection of existing values, investments, and enterprises;

(h) the burden of requiring the users causing harm to bear the loss; and

(i) the practicality of avoiding harm.

Compliance with factors (a), (b), (g), and (h) is not in dispute in this instance. To the extent Petitioner's use of water exceeds the amount necessary for him to operate his bathing facility, the other applicable common law requirements are not met.

29. There is no demonstrated economic and social value to allowing

Petitioner to let his wells flows freely. Petitioner drives no economic benefit from allowing excess water to flow unused into the Wekiva River. There is both economic and social value to the public at large to have available for use the additional water over and above what Petitioner actually needs to keep the swimming area open and available for use. Only by reducing flow can these common law requirements be satisfied.

30. Increased chloride concentrations, which could be curtailed by reducing use, are harming the source of the water which comes through Petitioner's wells. Reduction of flows, which may reasonably be expected to cause the saline water interface to recede, is a practical, workable means of maintaining Petitioner's investment in this property, while at the same time attempting to preserve the quality of the water coming from beneath the ground. Only by reducing flow can the common law requirements set forth in Section 8.2.2(e), (f), and (i), of the Applicant's Handbook be satisfied.

31. In addition to the criteria outlined above, insofar as any consideration of the allocation for recreational use is concerned, compliance with the criteria listed in Section 373.223(1)(b) and (c), Florida Statutes, would also have to be shown by Petitioner. This is due to the fact that no application was made for recreational uses, and therefore, allocation of water for this purpose would be considered as a *new* use.

32. The TSR recommends a permit of two years which in combination with the information that will be derived as a result of Other Conditions Nos. 6, 7, and 10 will allow the District to further assess the impacts of Petitioner's water usage and more precisely determine the amount of water which Petitioner needs to continue the operation of his recreational facility. These as well as the other permit conditions are reasonably drawn to protect the water resources of the area while allowing Petitioner a reasonable continued use of his property and facilities.

33. As a concluding matter, it should be noted once again that the Petitioner's application is only for 31.7 million gallons per year for uses at the campground other than recreational use. The Petitioner never filed an application for a permit for the remainder of the 12.47 million gallons per day the Petitioner has been using, and hopes to continue to use, for recreational purposes. Accordingly, although the District staff made recommendations regarding the issuance of a permit for recreational use and the parties consented to the litigation of issues regarding a permit for recreational use, in the final analysis, most of the findings of fact regarding the recreational use of water at Petitioner's

facility are irrelevant to the final action that can appropriately be taken here because, for the reasons set forth below, it appears to be inappropriate to grant Petitioner a permit for the recreational use of the water which has never been applied for.[1] First, because there has been no timely application for a permit for recreational use, and because the deadline for applications for existing uses has passed, any application for a permit for a recreational use of water would have to be evaluated pursuant to the criteria in Section 373.223(1), Florida Statutes, rather than the criteria in Section 373.226, Florida Statutes, which are applicable to the application that was filed. Second, to permit the Petitioner to amend his existing use application at this late date would tend to do violence to the intent of Sections 373.229 and 373.116, Florida Statutes, which require publication of notice of the filing of permit applications. This is because of the enormous magnitude of any such an amendment. The existing application is for 31.7 million gallons per year. Were the application to be amended to include the usage volume sought by Petitioner for recreational usage, it would be an application for 4.55 *billion* galons a year—a volume more than one hundred times greater than that sought by the existing application. Members of the public who had very little interest in a permit application for 31.7 million gallons per year might be very interested in a permit application for an amount more than one hundred times greater. The only way the public notice interests envisioned by Section 373.229 and 373.116, Florida Statutes, can be adequately implemented in this case is to require the Petitioner to file a new application for a permit for the recreational use of water.

In view of all of the foregoing, it is RECOMMENDED:

1. That the Governing Board of the St. Johns River Water Management District enter a final order approving the permit applied for by Petitioner for 31.7 million gallons per year, subject to the terms and conditions for such usage set forth in the Technical Staff Report.

2. That the final order include a conclusion that the District has jurisdiction over Petitioner's wells and that the Petitioner's recreational use of water is subject to the District's permitting authority.

3. That the final order conclude that Petitioner will not be granted a permit for the recreational use of water unless and until Petitioner files a new application for such use, notice of the application is duly given pursuant to Sections 373.229 and 373.116, Florida Statutes, and the

---

[1] Although many of the findings made here are irrelevant to the disposition of this case, they may nevertheless prove useful to the parties in the event of a subsequent application for recreational use.

new application is determined to satisfy the criteria set forth in Section 373.223(1), Florida Statutes.

DONE AND ENTERED this 10th day of March, 1987, at Tallahassee, Florida.